UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MELVIN FELIZ,<br>IRVING OLIVERO-PENA, a/k/a<br>Fausto Molina, and<br>ROBERT CRAWFORD,<br><br>        Defendants | Crim. No. 14-327 (KM)<br><br>FINDINGS and ORDER<br>(*Youngblood* motion) |

## I.    Introduction

The government's case at trial includes evidence of a face-to-face delivery of narcotics related cash on October 22, 2012. That transaction allegedly was between Kevin Blanco, a cooperating individual who had recently been arrested, and defendant Irving Olivero-Pena, a/k/a "Fausto Molina," a/k/a "Joey."[1] The government recently disclosed to defense counsel a statement by Blanco that he recalled that a telephone call or calls between himself and "Joey" before the October 22 transaction had been recorded. Because no such recording was produced in discovery, counsel for Olivero-Pena moved for a hearing as to whether the government had failed to preserve exculpatory evidence. Defendants seek to have the testimony of Blanco excluded in its entirety.

I convened an evidentiary hearing on January 26, 2015. The government produced two witnesses: DEA Task Force Officer Michael Calvano, and DEA Special Agent John Clayton, who was the case agent in charge of the investigation. Although the motion was Olivero-Pena's, I permitted all defense counsel to cross-examine. The government again proffered at the hearing that Blanco had stated that he believed his call(s) to "Joey" had been recorded.

---

[1]    I do not prejudge the issue of whether Olivero-Pena and "Joey" are the same person, which may or may not be contested at trial.

Based on that proffer, defense counsel did not seek to call Blanco for cross-examination. I left open the record so that the United States could furnish the defense with a redacted copy of an internal document sufficient to show the date that the case agent applied for authorization to do the October 22 controlled delivery. The government thereafter did not turn over any such document, but proffered that Clayton first requested authorization for the transaction on October 23, 2012, one day after the currency was retrieved from New Jersey, and approximately four days before Blanco was to deliver it to California. (No. 133). Also after the hearing, the government turned over a second "money flow report" by Clayton, dated November 1, 2012 (J68). I have considered this report, as well as the defense's written arguments based on it. Counsel for Olivero-Pena filed two post-hearing letter submissions. The government submitted a one-page letter.

As I informed counsel at the time, my chief purpose at this pretrial hearing was to determine whether there had been a failure to preserve evidence, rising to the level of a due process violation, that might lead the court to impose such a severe sanction as exclusion of a witness's entire testimony. If so, a pretrial ruling might avert a potential mistrial. On the other hand, if the failure to preserve evidence did not occur at all, if it proved to be the ordinary stuff of cross-examination, or if in general it failed to rise to the level of a due process violation, the issue might more appropriately be handled at trial.

In *Arizona v. Youngblood,* 488 U.S. 51 (1988), the Supreme Court held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. *See also United States v. Heiser*, 473 F. App'x 161, 166 (3d Cir. 2012); *Yarris v. County of Delaware*, 465 F.3d 129, 142 (3d Cir. 2006). The evidence at the hearing did not rise to a showing of bad faith on the part of the DEA officers and agents. Nor can I conclude from this record that these brief telephone calls between Blanco and Joey contained exculpatory material. Nor did I hear any convincing evidence that any such call was recorded at all. I will therefore deny the motion without prejudice to renewal in light of a more developed record at trial.

## II.   Evidence at the Hearing

DEA Task Force Officer Michael Calvano testified that, on October 12, 2012, he was one of the officers who arrested Blanco in Florida. Blanco was taken to a hotel room, where he and another cooperating individual were

2

monitored by at least two law enforcement agents at all times. Blanco agreed to cooperate with respect to "two or three" narcotics trafficking organizations. One was associated with a person he knew as "Joey"; another was associated with a person he knew as "Tio."

Calvano did not work every shift, and could not recall whether Blanco made any undercover telephone calls on October 13, 14, or 15. On those dates, Calvano had a recording device with him. He did not make any recordings. From October 16-18, Blanco was with the agents in New York, and he then returned to Florida. Essentially, Calvano remembered no calls, recorded or unrecorded, between Blanco and "Joey" in this period. Calvano stated that he learned there had been such a call, but did not know if it had been recorded.

DEA Special Agent John Clayton was the case agent in charge of the investigation. Clayton confirmed that Blanco was arrested on October 12, 2012, and taken to a hotel room in the early hours of October 13, 2012. From October 13, 2012, through October 15, 2012, Blanco made recorded calls, but those calls were to Tio, not Joey. (The testimony was somewhat unclear, but there may have been unsuccessful attempts to call Joey. Telephone records introduced later in the hearing corroborated the proposition that there were no calls with Joey from October 12-15, 2012.) All of the recorders used for Blanco's calls from October 13-15, 2012, were returned to the DEA office on October 15 for downloading. No calls to or from Joey were on the recorders.

Agent Clayton testified credibly that the agents and Blanco left the Miami hotel room (where some conversations had been recorded) on October 15, and that all of the DEA's recording equipment had been turned in so that the contents could be downloaded at that time.

On the morning of October 16, 2012, Blanco surrendered certain forfeitable funds, then drove with the agents to catch a 1:40 pm flight to New York. On October 19, 2012, he returned to Florida, at which time he was released from the agents' custody and permitted to return home. He was not issued a recording device.

On the morning of the 16th, Blanco was turning over currency to the DEA as part of a criminal forfeiture. He and the agents then caught a 1:40 pm flight from Florida to New York. Agent Clayton testified that to his knowledge, no recording devices were checked out by the agents involved in the "Joey" investigation between October 16 and October 22.

Clayton's report confirms that, at the direction of himself and Calvano, "the CS made multiple telephone calls to [x]7318, to coordinate the delivery of the TDF in New Jersey." Clayton introduced records of a telephone number ending in 2880, associated with Joey, for the period October 12-18, 2012. The records show no Blanco/Joey calls from October 12 through October 15, 2012.

The defense focused particularly on two calls on October 16, 2012. Phone records establish that at 11:08 am (when Blanco was inferably en route to the airport), there was an 84 second call from Joey to Blanco. The same day, at 6:27 pm (when Blanco was in New York), the records show a 3 minute call from Blanco to Joey.

The record contains no recording of those calls, and there is no independent evidence that either was recorded. Clayton testified credibly that he has no knowledge of any call between Blanco and Joey that was recorded, but for which the recording no longer exists or was not turned over.

There was no testimony as to the content of the calls. The transaction in which Blanco allegedly picked up currency in New Jersey occurred on October 22, 2012, and his alleged delivery of the cash to Crawford in Ontario, California took place on October 27, 2012. (J-06, ¶¶ 3, 7, 8). The defense, on cross-examination, suggested that the entire transaction must have been negotiated in the unrecorded phone calls between Blanco and Joey. Clayton testified that the October 22, 2012 transaction had already been arranged at the time of Blanco's arrest, and that only some logistical coordination was required.

The first Report of Investigation, titled a "money flow report," of Agent Clayton relates statements by Blanco about negotiations with Joey in "October 2012," followed by Blanco's post-arrest statement on October 13, 2012, that he had "received the contract to receive the [funds]" in Newark. (J6 ¶2) Defense counsel respond, however, that a second "money flow report" by Clayton, dated November 1, 2012, mentions that Blanco was "currently" being "solicited" to do a transaction with Tio's representative (J68 ¶¶ 3, 5); the defense finds it significant that the same report describes multikilogram transactions involving Feliz and Joey but does not state that such a transaction is currently pending.[2]

---

[2] That omission may or may not be a lapse, or it may be fodder for cross-examination. It does not tend to establish that the calls to Joey were recorded or would be exculpatory.

4

The government supplemented the record with a representation that Agent Clayton first submitted a request for authorization of an undercover money pickup on October 23, 2012. That first submission was voided, and a second was submitted the following day. Approval was granted on October 25, 2012. The application and approval thus came after the cash pickup on October 22, 2012, but before the California delivery on October 27, 2012.[3]

Both Clayton and Calvano testified more generally that it is DEA's policy to record or otherwise memorialize calls between a cooperating individual and a subject. They also stated in substance that this is not always done. For example, a recording device might not be at hand, or the agents for security reasons might decide not to record a call made in a public setting where it could be seen. The witnesses suggested reasons that these particular Blanco/Joey calls would not have been recorded, but did not testify specifically that such a decision was made or state the basis for it.

### IV. Conclusions of Fact and Law

1. Due process may be violated by a "bad faith ... failure to preserve potentially useful evidence." *See Arizona v. Youngblood, supra.* Bad faith may be established by a showing that the law enforcement officers "knew 'of the exculpatory value of the evidence at the time it was ... destroyed.'" *Yaris,* 465 F.3d at 142 (quoting *Youngblood,* 488 U.S. at 57 n.*). The law enforcement officers, by the manner in which they handle the evidence, may "by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id.* (quoting *Youngblood,* 488 U.S. at 58).

---

[3] The government stated on the record that Clayton submitted a request for authorization of an undercover money pickup, consisting of a memo, which might be redacted to show the date. In a follow-up letter, the government stated that there was not a memo, because the process consisted only of an electronic input. (I fail to see why such input could not be printed out, however.) I cautioned them at the hearing, and caution them now, that any content that tends to impeach a witness or that constitutes Jencks would have to be turned over, irrespective of the demands of DEA counsel, although internal procedures could be shielded.

The significance of the request, from the defense point of view, lay not in the content but in the date, which they believed would help them corroborate the timing of events. (In particular, they regard it as potential indirect evidence that the transaction originated in the Blanco/Joey telephone calls, rather than before.) The date has now been furnished. The government represents that Agent Clayton submitted the request for authorization of an undercover money pickup on October 23, 2012. That first submission was voided, and a second was submitted the following day. Approval was granted on October 25, 2012. The application and approval followed the pickup, which, as noted above, occurred on October 22, 2012.

2. I have no sufficient basis to conclude that the Blanco/Joey calls contained anything exculpatory. There has not yet been any testimony as to the content of the calls. Blanco, an arrestee cooperating in setting up a transaction that would reduce his own criminal exposure, would not naturally be expected to exculpate his interlocutor, Joey.

3. There is not sufficient evidence that recordings of these calls ever existed. Blanco at some point recalled that his calls were recorded. The agents, who would generally have been responsible for recording the calls, testified that the relevant Blanco/Joey calls were not recorded, and that there are and were no such recordings in their possession. The case agent would have reason to know of the existence of such recordings. There was an established practice of downloading and preserving calls that were recorded. At the time of the calls, DEA's recording equipment was not in the field, but checked in.

4. The defense on cross-examination attempted to establish that recording was nonetheless feasible. Calvano had access to a recorder, for example, and it appears that Blanco himself, as of November 6, 2012, had the capability to record a call at his home. That theoretical availability of a recorder falls short of convincing proof that these calls were in fact recorded.

5. Other circumstances corroborate the conclusion that the calls were not recorded. The agents and Blanco were no longer ensconced in a hotel room with recording equipment. The call at 11:08 am on October 16th, as the defense established on cross-examination, inferably took place in a car on the way to the airport. Moreover, it originated with Joey, not Blanco, making it less likely that anyone was prepared to record it. The call at 6:27 pm occurred when Blanco apparently had just arrived in New York City.

6. The agents testified credibly that for practical reasons, not all calls are recorded. Failure to record these calls would have been more difficult to explain had they been made from the Miami hotel room, interspersed with calls to "Tio" that were recorded, but that was not the case. The most likely scenario is not destruction of evidence, but an ordinary discrepancy between the agents' testimony and that of Blanco, who did in fact record a number of calls in that time period. That issue can perhaps be explored more fully at trial.

7. Finally, I can find no sufficient showing of bad faith, as required by *Arizona v. Youngblood, supra.* There is no evidence that the law enforcement

6

officers had any reason or motive to destroy recordings of these calls, even assuming that such recordings ever existed. I cannot assume, in the absence of evidence, that the calls were exculpatory, giving the DEA a motive to fail to preserve recordings.

8. The defense's theories of bad faith are inconsistent and unsupported. Counsel for Olivero-Pena, for example, suggests bad faith because the DEA violated its policy by not recording calls, but the entire premise of his motion is that the DEA did record the calls. A contention that the agents should have recorded the calls, but did not, does not make out a *Youngblood* claim.

9. My focus here is to determine whether, at the pretrial stage, there is a sufficient pretrial showing of a due process violation to require exclusion of Blanco's testimony. Based on the current record, there was not such a showing. The court does not, however, have the benefit of the full record at trial, so the motion will be denied without prejudice to renewal at trial.

**ORDER**

IT IS THEREFORE this 29th day of January, 2015

ORDERED that the motion to exclude testimony based on alleged failure to preserve exculpatory evidence is DENIED.

**HON. KEVIN MCNULTY**
**United States District Judge**